[Civ. No. 44571. First Dist., Div. Three. Feb. 26, 1980.]

BUILDING CODE ACTION et al., Plaintiffs and Respondents, v. ENERGY RESOURCES CONSERVATION AND DEVELOPMENT COMMISSION, Defendant and Appellant.

578

580

COUNSEL

William M. Chamberlain, Christopher Ellison and Rick Ratliff for Defendant and Appellant.

John W. Keker, William A. Brockett and Keker & Brockett for Plaintiffs and Respondents.

OPINION

FEINBERG, J.—The facts of the case are partially set forth in the opinion of this court upon denial of a petition for writ of supersedeas. (*Building Code Action v. Energy Resources Conservation & Dev. Com.* (1979) 88 Cal.App.3d 913 [152 Cal.Rptr. 214].) The facts material to this appeal are as follows:

In March 1976, the Energy Resources Conservation and Development Commission (Commission) gave notice of hearings on proposed amendments to energy conservation regulations for new residential construction. Over the next year, a series of hearings were held before a committee of the Commission and a final adoption hearing before the full Commission at which the public was allowed to participate. The

construction industry was most effectively represented by Building Code Action (BCA) which challenged the economic feasibility or "cost effectiveness" (88 Cal.App.3d at p. 915, fn. 1) of the proposed regulations. The Commission's staff contracted with the Lawrence Berkeley Laboratory to conduct computer studies to determine whether the regulations were cost-effective. BCA's executive director was given broad access to the facilities and personnel at the laboratory, and on occasion received results of the studies before the Commission's staff did. At the hearings, the staff presented its recommendations with supporting expert testimony, and BCA was allowed to, and did, cross-examine the experts, present rebuttal witnesses, and introduce documentary evidence.

Among the proposed regulations was one which required double-glazing of windows in certain areas of the state. The areas were defined by "degree-days."[1] Any increase in double-glazing standards, all else being equal, would entail increased glass manufacture and thus have implications for environmental quality, although the glass manufacturing industry is relatively nonair-polluting, has a good record of compliance with environmental regulations, and is decentralized. Initially, the staff recommended that double-glazing be required in areas having more than 4,500 degree-days. The staff prepared a study of the overall environmental impact of the proposed amendments, not considering double-glazing separately but taking into account some increased glass manufacture, and concluded that there would be no significant impact on the environment. Accordingly, a "negative declaration," in lieu of an "environmental impact report" (EIR), was prepared. Later, during the course of the hearings, the staff proposed expanding the double-glazing requirements to include all areas in excess of 3,000 degree-days. A study which assessed the impact of increased glass production and concluded that the impact on the environment would not be significant was prepared, together with a new negative declaration. The study, however, indicated that if the requirement were extended to all areas in excess of 2,500 degree-days, 10 times as much glass would have to be produced (compared to the 3,000 degree-days standard) and "localized air quality impact in the San Joaquin Valley

---

[1]"Degree-days" is a measurement "based upon temperature difference over time. For any one day, when the mean temperature is less than 65°F, degree-days equal the number of Fahrenheit degrees difference in temperature between the mean temperature for the day and 65°.... To get yearly degree-days, one simply adds the degree-days for each day.... As the climate gets milder, the degree-days tend to decrease." Los Angeles, for example, has less than 2,500 degree-days, San Francisco about 3,000.

would have been about ten times as much as with the [3,000 degree-days standard] and might have been significant." This indication, according to the testimony before the Commission of a staff environmental assessment specialist, was based on the assumption of "worst case" conditions, i.e., that everything which could occur to produce an adverse environmental impact would occur.

At the adoption hearing of March 11, 1977, the Commission rejected the staff's 3,000 degree-day standard and adopted, effective January 1, 1979, a 2,600 degree-day standard recommended by a citizens' advisory committee. In a transitional period, beginning July 1, 1978, double-glazing would be required in areas having more than 3,500 degree-days. The result of the 2,600 degree-day standard was that 28 northern California cities, including Fresno, Oakland, Sacramento, San Jose and Stockton, were included in the area in which double-glazing would be required. (The adoption of a 2,500 degree-day standard would have resulted in the inclusion of four more cities, Redwood City, San Luis Obispo, Santa Clara, and Vallejo.) At the same time, the Commission adopted a "glazing area" standard more stringent than that recommended by the staff, reducing the maximum permissible ratio of window space to floor space from 20 percent to 16 percent.[2] The effect of the double-glazing requirement as adopted would be to bring about an increase of glass production, but not as great an increase as if a 2,500 degree-day requirement had been adopted, and that increase would be offset somewhat by the reduction of permissible glazing area. No new studies of the possible environmental impact were undertaken. The Commission determined that the double-glazing requirement would have no significant effect on the environment and, therefore, it did not obtain an EIR.

One week before the adoption hearing, on March 4, 1977, a Friday, the committee before which the public hearings had been held reported to the full Commission, recommending adoption of the staff's proposed standards governing not only glazing but also insulation, the efficiency of appliances, and climate control systems. The report's conclusions as to the cost-effectiveness of the standards were based, in part, on the contracted computer studies, the results of which were thus made known. BCA's director received the report on Monday, March 7. He then had until March 11 to prepare arguments to be presented at the

---

[2]A higher ratio of window area to floor area was permitted, under standards recommended by industry participants, if other aspects of the building design compensated for the greater energy consumption.

adoption hearing against the report's conclusions. BCA asserts that it could not effectively counter the cost-effectiveness conclusions prior to March 7 because, until it received the March 4 report, it did not know upon which methods and variables the staff computer studies were based. At the hearing, the staff studies were not made part of the administrative record. The director of BCA, however, sought to introduce 6,000 pages of new evidence, consisting largely of other computer calculations in a raw or, in any case, undigested form, which were intended to rebut the cost-effectiveness conclusions. The Commission refused to receive the new evidence but did allow the director to submit a twenty-nine-page analysis of the standards, seven additional pages relating to a particular standard, and four hand-written pages summarizing the computer calculations.

The Commission adopted the report's recommendations, with the modifications advocated by the public, which were noted above.

BCA filed a petition for writ of mandate, seeking to set aside all of the regulations on the ground that the Commission's determination of cost-effectiveness was procedurally unfair and arbitrary and capricious. BCA also sought an order setting aside the negative declaration relative to the double-glazing standard and requiring the preparation of an EIR.

The trial court ruled that, under *Pitts* v. *Perluss* (1962) 58 Cal.2d 824 [27 Cal.Rptr. 19, 377 P.2d 83], it would limit its review of the Commission's action to whether the hearings were procedurally regular and would not reweigh the evidence before the Commission. The court also ruled, over the Commission's opposition, that it would consider evidence outside the administrative record—again, not in order to substitute its judgment for that of the Commission but in order to determine whether the hearings were fair. The court heard the testimony of BCA's executive director as to his limited opportunity to respond to the computer studies on which the cost-effectiveness conclusions of the March 4 report were based.

The court found that assessment of cost-effectiveness depended on the computer studies, that knowledge of the methods and variables of the studies was essential to public criticism of the results of the studies, and that such knowledge was not available to the public until March 4. The court further found that the BCA's "ill-organized offer of evidence"—i.e., the 6,000 pages of computer calculations—was the best response that could be expected, given the "magnitude of the task" and

the limited time available, and the Commission should have accepted it. The court did not explicitly find that, as an alternative, the Commission should have granted BCA more time to prepare a response, but it concluded that the Commission's failure to provide the public in general and BCA in particular with "reasonable access" to the contracted computer studies and a "reasonable opportunity" to analyze and criticize the report's cost-effectiveness conclusions constituted a failure to provide a full and fair hearing.

The court also found that the Commission's adoption of the 2,600 degree-day double-glazing standard raised "a distinct possibility" of environmental impact by reason of the necessity for greatly expanded glass production, and that an EIR was required.

The court therefore declared invalid, and granted a writ of mandate commanding the Commission to set aside, wall and ceiling insulation regulations, the double-glazing and glazing area standards, and a definition of "special glazing." (The double-glazing regulation was declared invalid both for failure to provide a fair hearing and for failure to prepare an EIR.) Other regulations were allowed to stand; the status pending appeal of the regulations declared invalid is described in *Building Code Action* v. *Environmental Resources Conservation & Dev. Com., supra*, 88 Cal.App.3d 913.

Questioned on appeal is the correctness of the trial court's determination (1) that the Commission failed to provide a fair hearing, (2) that an EIR was required, and (3) that judicial review of the Commission's adoption of regulations permits the taking of evidence outside the administrative record.

### (1)

■ It is important to note at the outset that the Commission's adoption of regulations was a quasi-legislative proceeding, and notions of fairness or due process associated with judicial or even quasi-adjudicatory proceedings are not applicable. (*Franchise Tax Board* v. *Superior Court* (1950) 36 Cal.2d 538, 549 [225 P.2d 905]; *California Optometric Assn.* v. *Lackner* (1976) 60 Cal.App.3d 500, 505 [131 Cal.Rptr. 744]; *Rivera* v. *Division of Industrial Welfare* (1968) 265 Cal.App.2d 576, 587 [71 Cal.Rptr. 739].) ■ "As to the quasi-legislative acts of administrative agencies, 'judicial review is limited to an examination of the proceedings before the...[agency] to determine whether...[its] ac-

tion has been arbitrary, capricious, or entirely lacking in evidentiary support, or whether...[it] has failed to follow the procedure and give the notices required by law.' [Citations]." (*Pitts* v. *Perluss* (1962) 58 Cal.2d 824, 833 [27 Cal.Rptr. 19, 377 P.2d 83]; *California Assn. of Nursing Homes etc., Inc.* v. *Williams* (1970) 4 Cal.App.3d 800, 810 [84 Cal.Rptr. 590, 85 Cal.Rptr. 735].) Here the trial court, as BCA states in its brief, "refused to second-guess the Commission under the arbitrary and capricious standard." Instead, it ruled that the Commission failed to provide a fair hearing—i.e., failed to follow the procedure required by law. The Public Resources and Government Codes specify the procedures which the Commission must follow in adopting regulations.

Public Resources Code section 25402, subdivision (a), mandates the adoption of building design and construction standards increasing efficient use of energy "after one or more public hearings." Section 25213 provides: "The commission shall adopt rules and regulations, as necessary, to carry out the provisions of this division in conformity with the provisions of Chapter 4.5 (commencing with Section 11371) of Part 1, Division 3, Title 2 of the Government Code. The commission shall make available to any person upon request copies of proposed regulations, together with summaries of reasons supporting their adoption." Section 25214 provides that "All meetings and hearings of the commission shall be open to the public, and opportunity to be heard with respect to the subject of the hearings shall be afforded to any person" and "[u]pon request, an interested party may be granted reasonable opportunity to examine any witness testifying at the hearing." The Government Code sections incorporated in section 25213 encompass the Administrative Procedure Act, relevant portions of which require the giving of notice of proposed regulations (§ 11423), in express terms or by summary (§ 11424, subd. (c)) and specify that at the noticed hearing "the state agency shall afford any interested person...the opportunity to present statements, arguments, or contentions in writing, with or without opportunity to present the same orally....[and] shall consider all relevant matter presented to it before adopting...any regulation." (§ 11425.)

■ In summary, the foregoing statutes required the Commission to follow this procedure:

(a) To give notice of proposed regulations and of hearing thereon,

(b) To make available a summary of reasons for the regulations,

(c) To hold at least one public hearing, (i) at which any member of the public *shall* be given the opportunity to be heard to present statements, arguments or contentions in writing, (ii) and *may* be heard to present the same orally, (iii) and *may* examine witnesses testifying at the hearing, and

(d) To consider all the relevant matter presented to it before adopting the regulations.

The Commission contends that it complied with this procedure.

■ ■■■ The trial court's ruling[3] would seem to impose the additional requirements that the Commission:

(e) Make available to the public the basis for its determination that the regulations are cost-effective,[4] and

(f) Give the public a reasonable opportunity to rebut that basis.[5]

---

[3]The court also ruled that the Commission should have received the 6,000 pages of computer calculations tendered by BCA. The court recognized that this material was practically useless in the form in which it was offered but assigned responsibility for its uselessness to the Commission's failure to allow adequate time to organize it properly. We do not believe that the Commission was required to receive useless material, regardless of who was to blame for its uselessness, and that the crucial question is whether the Commission should have allowed more time to organize the material. Further, the Commission did receive a 4-page handwritten summary of the material, and we are not shown in what way the 4 pages inadequately summarized the 6,000.

[4]The Commission interprets the court's ruling as requiring that the computer studies be made a part of the record. We agree with the Commission that the law does not require that such studies be introduced as evidence, at least where they are otherwise available to the public, but we do not agree with the Commission's interpretation of the court's ruling and do not understand BCA to contend that anything more was required than that the basis for the cost-effectiveness conclusions be made available. Of course, *the Commission* must put on the record all of the information which it considers (*Morgan v. United States* (1936) 298 U.S. 468 [80 L.Ed. 1288, 56 S.Ct. 906]; *California Optometric Assn.* v. *Lackner, supra,* 60 Cal.App.3d 500, 509; *California Assn. of Nursing Homes etc., Inc.* v. *Williams, supra,* 4 Cal.App.3d 800, 814), but there is no requirement that the record include all the information upon which *its staff* bases its recommendations. (See *Ray* v. *Parker* (1940) 15 Cal.2d 275, [101 P.2d 665].)

[5]The Commission also interprets the trial court's ruling as requiring it to decide upon regulations and whether they are cost-effective and then to afford the public an opportunity to rebut that *decision*. The court's findings, particularly when viewed in the light of its notice of intended decision, are subject to that interpretation, but BCA characterizes that interpretation as a "strawman" and disavows any such contention. All BCA insists upon is disclosure of, and an opportunity to rebut, the evidence upon which the decision is based.

The Commission did comply with (e) but, the trial court found, it did so at such a time, relative to the adoption hearing, that it was as though it had not done so at all, because it did not give BCA a reasonable amount of time within which to rebut the determination. The Commission's position, then, in its starkest terms, is that it does not have to allow such rebuttal. Its alternative stance is that the opportunity for rebuttal was adequate.

A strict construction of the statutorily prescribed procedure is inconsistent with a requirement of an opportunity for rebuttal. If the Commission were to hold but one hearing, afford the opportunity to present statements in writing, but exercise its discretion not to permit oral statements or examination of witnesses, then it would have conformed to the letter of the law but, in the nature of things, no rebuttal would be possible.

BCA contends that there is a decisional gloss upon the statutes which requires an opportunity for rebuttal and that the opportunity here was inadequate. The California authorities relied upon by BCA are *Olive Proration etc. Com.* v. *Agri. etc. Com.* (1941) 17 Cal.2d 204 [109 P.2d 918], *Rivera* v. *Division of Industrial Welfare, supra,* 265 Cal.App.2d 576, and *California Assn. of Nursing Homes etc., Inc.* v. *Williams, supra,* 4 Cal.App.3d 800.

In *Olive Proration*, a commission was required by statute to hold a hearing upon a petition to determine whether a certain fact had been established and, if so, to take a certain action. The commission had held a hearing, determined that the fact had not been established, and denied the petition. Later, without holding any further hearing but after considering a report by another state agency, the commission rescinded its prior order denying the petition and granted it. The court said: "The parties were not apprised that this. . . [report] was being made or of the result of it until after the last order of the commission was promulgated. As a result, they were denied all right of cross-examination with respect thereto and also of an opportunity to make a counter showing in rebuttal. Under such circumstances, the statutory requirement of a hearing was not met. [Citations.] Only evidence which the opposite party has an opportunity to refute at the hearing may be relied upon as the basis of a finding. [Citations.]" (17 Cal.2d at p. 210.) In *Olive Proration*, as distinct from the present case, the commission's action was based on evidence as to which no hearing was held. It would appear

that if a hearing had been held, the report introduced as evidence, and the "opposite party" given an opportunity to show that the fact had not been established, then the statutory requirement would have been met, regardless of whether there was, strictly speaking, "cross-examination" or "rebuttal."

*Olive Proration* is cited by *Rivera* for the proposition that "where the agency's staff brings in factual material not available to the public, such as a specially conducted survey, the parties must be apprised of it during the hearing process and cross-examination and rebuttal permitted." (265 Cal.App.2d at pp. 588-589, fn. omitted.) What was at issue in *Rivera* was a commission's receipt and consideration of a statistical study before adoption of disputed orders but after the last public hearing. Again, it appears that what is meant is that private material should not be considered by a commission except at a hearing at which the public has a chance to be heard with respect to the material.

*Olive Proration* and *Rivera* are cited by *Nursing Homes* for the narrower proposition that "Generally, an administrative agency, directed to fix rates or price levels after a hearing, may not base its decision upon evidence outside the record and not made available for rebuttal by the affected parties." (4 Cal.App.3d at p. 811, fn. omitted.) There, an administrator failed to hold any hearings establishing an administrative record. The narrower reading of *Olive Proration* is noteworthy, for it may be seen that the authorities relied upon by that case all involve administrative rate-setting which, such authorities themselves recognize, is a quasi-judicial or adversary proceeding (*Morgan* v. *United States* (1937) 304 U.S. 1, 14-15 [82 L.Ed. 1129, 1130-1131, 58 S.Ct. 773]; *United States* v. *Abilene and So. Ry. Co.* (1924) 265 U.S. 274, 289 [68 L.Ed. 1016, 1023, 44 S.Ct. 565]; *Int. Com. Comm.* v. *Louis. & Nash. R.R.* (1913) 227 U.S. 88, 91, 93 [57 L.Ed. 431, 433, 434, 33 S.Ct. 185]; see *Morgan* v. *United States, supra*, 298 U.S. 468, 480 [80 L.Ed. 1288, 1294]), whereas, at quasi-legislative hearings, the requirements of "opportunities for cross-examination and rebuttal" are "far less stringent." (*Rivera* v. *Division of Industrial Welfare, supra*, 265 Cal.App.2d at p. 587.)

Even in rate-setting cases, the Administrative Procedure Act does not require "trial-like hearings." In *California Optometric Assn.* v. *Lackner, supra*, 60 Cal.App.3d 500, the trial court granted declaratory relief invalidating regulations fixing rates for optometric services and

eye appliances and specifying the nature of the proceeding necessary for the adoption of valid regulations to include the right of cross-examination and opportunity for rebuttal. Justice Friedman (the author of *Rivera* and *Nursing Homes*) surveyed the requirements of the act and wrote: "The trial court's fixed directions for cross-examination and rebuttal are...erroneous. No statutory or decisional doctrine establishes ineluctable rights of cross-examination and rebuttal at quasi-legislative hearings....Decisions requiring or dispensing with cross-examination at quasi-legislative hearings vary with the governing statutes and turn also upon the kind of evidence, whether factual or argumentative. [Citations.] The clause in section 11425...[quoted above] which permits the agency to proceed without opportunity for oral presentation is quite inconsistent with unyielding rights of cross-examination and rebuttal." (*Id.*, at pp. 507-508.) The declarations of *Rivera* and *Nursing Homes,* in relation to *Olive Proration,* are summarized: "Relative to rebuttal opportunities, they sought a middle ground between multilateral rebuttal among the contending parties and their legitimate need to confront the body of data upon which the agency intends to act. They meant that the agency may not utilize the public proceeding as a facade for a private decision resting upon privately acquired data. They meant that post-hearing evidence, if any, must be incorporated in an identified body of evidence and preserved for possible judicial review." (*Id.*, at p. 510.)

We agree with Justice Friedman that rebuttal is not an "ineluctable right" at quasi-legislative hearings and that whether it is required depends on the nature of the particular evidence sought to be rebutted.

At issue here are computer studies showing the proposed regulations to be cost-effective. The Commission relied on conclusions drawn from these studies. The conclusions were presented at a public hearing. At the hearing, and even prior to the hearing, the studies themselves were available to the public. The public, including BCA, had an opportunity to present *factual statements* and arguments contrary to the conclusions drawn from the studies.

We hold that the opportunity was reasonable. All BCA had to do was to identify the assertedly wrong variables or values and state why they were wrong. It did not have to provide the right answers; concededly, that would have required a longer period of time than the time available after the studies were released. But the preparation of this

"positive" showing did not have to await the release of the studies. BCA's director was sufficiently informed of the regulations which were being formulated and acquainted with the nature of the computer studies which were under way that he could have proceeded to produce calculations showing the regulations not to be cost-effective even before the studies were complete. That task would be complicated by the lack of regulations in a fixed form, but that difficulty is inherent in the process, because the regulations are not fixed until they are adopted. BCA does not contend that the Commission could not change the regulations at any time before the moment of adoption. (See *Schenley Affiliated Brands Corp.* v. *Kirby* (1971) 21 Cal.App.3d 177, 193 [98 Cal.Rptr. 609].)

We therefore reverse the judgment as to the determination that the Commission failed to provide a fair hearing.

### (2)

■ Under Public Resources Code section 21160, the Commission's decision to prepare a negative declaration in lieu of an EIR is reviewable by administrative mandamus. (Code Civ. Proc., § 1094.5.) "Judicial review of that decision is limited to determining whether there was an abuse of discretion. Such abuse is established where the agency has not proceeded in a manner required by law or has reached a decision not supported by substantial evidence. (Pub. Resources Code, § 21168.5.)" (*Hixon* v. *County of Los Angeles* (1974) 38 Cal.App.3d 370, 379 [113 Cal.Rptr. 433].) We make an independent examination of the record to determine whether there has been such abuse. (See *Patterson* v. *Central Coast Regional Com.* (1976) 58 Cal.App.3d 833, 842 [130 Cal.Rptr. 169].)

Public Resources Code section 21080.1 provides that a "lead agency"[6] has the responsibility to determine whether an EIR or a "negative declaration"[7] is required for a project. The California Administrative Code directs the lead agency, unless it can determine that a project

---

[6]Defined by section 21067 as "the public agency which has the principal responsibility for carrying out or approving a project which may have a significant effect upon the environment."

[7]Defined by section 21064 as "a written statement briefly describing the reasons that a proposed project will not have a significant effect on the environment and does not require the preparation of an environmental impact report." Section 21068 defines "a significant effect on the environment" as "a substantial, or potentially substantial, adverse change in the environment." The Administrative Code provides that the effect of

will clearly have a significant environmental effect, to conduct an "initial study" examining whether the project will have such effect. (Cal. Admin. Code, tit. 14, § 15080.) A project should be found to have such effect if it has the potential to degrade the quality of the environment or will cause substantial adverse effects on human beings. (*Id.*, § 15082, subds. (a) and (d).) When the lead agency finds on the basis of an initial study that a project will not have a significant effect, it must prepare a negative declaration, give notice of such preparation within a reasonable time of adoption of the declaration, provide the public with sufficient opportunity before the project is approved to respond to the finding, and, after approving the project, file a notice of determination of no significant effect. (*Id.*, § 15083.)

When the Commission met on March 11, 1977, it had before it a proposal for a 3,000 degree-day double-glazing standard. A "revised negative declaration," dated January 4, 1977, had been prepared, assuming a 3,000 degree-day standard. As a basis for a finding that the double-glazing standard would not have a significant adverse impact on the environment, it referred to an "initial study" of 1976, supplemented on January 4, 1977, to the effect that the standard, taken together with other regulations, "may" increase the consumption of glass, but not significantly in relation to the total consumption of that material, and therefore the effect on air quality of increased manufacturing of glass would also be insignificant. As related above, the supplemental study also noted that extending the requirement to areas in excess of 2,500 degree-days might have a significant impact on air quality. Early in the morning session of March 11, a Commissioner proposed that the standard be amended to 2,500 degree-days. BCA's executive director argued against the proposed amendment. Others were heard, other topics were opened up, and the discussion continued into the afternoon. No evidence was heard bearing on the environmental effect of the extended degree-day standard. Quite late in the day, the Commissioner who offered the amendment observed that "the Staff can show cost effectiveness...down to about 2,500 degree-days" and proposed "for safety's sake...to change the double-glazing requirement to 2,600 degree-days, to give a little allowance for error." Before a vote was taken on the amendment, the negative environmental impact declaration, still assuming a 3,000 degree-day standard, was adopted by the Commission, and

---

one aspect of a project should be assessed individually, as well as together with other aspects, and without regard to whether the overall effect of the project is adverse or beneficial. (Cal. Admin. Code, tit. 14, § 15080, subd. (a); see § 15082, subd. (c).)

its chairman directed the staff to give notice of the determination that the regulations would not have a significant impact on the environment. Then, without any opportunity for the public to respond to the finding of no significant effect on the environment, the 2,600 degree-day standard was adopted. Revised negative declarations dated March 17 and 23, also assuming a 3,000 degree-day standard, were later formally filed.

The trial court found that extending the double-glazing standard to 2,600 degree-day areas "raise[d] a distinct possibility of environmental impact by reason of the necessity for greatly expanded glass production." The apparent basis for this finding was the supplement to the initial study, which did distinctly raise that possibility, if the standard were extended to *2,500* degree-days. The Commission argues that there was substantial evidence that the *2,600* degree-day standard would not have a significant effect, and therefore its determination should have been sustained. That evidence was: (a) the staff's opinion was based on the worst possible combination of circumstances, (b) the glass industry is relatively nonpolluting, (c) the increase from a 2,500 to a 2,600 degree-day standard excluded 4 cities from the double-glazing requirement, and (d) when the 2,600 degree-day standard was adopted so, too, was a lower ratio of window to floor area, which also would have the effect of reducing the need for glass production.

We believe that the Commission abused its discretion by adopting the negative declaration at a time when the question of the environmental effect of the 2,500 degree-day standard had been raised by the supplement to the initial study and no further evidence taken or consideration given to the environmental impact of a 2,600 degree-day standard and without conforming to the Administrative Code's requirement of notice and opportunity to be heard.

It does not follow, however, that, as the trial court concluded, an environmental impact report should have been prepared. If it had followed the proper procedure and considered the appropriate evidence, the Commission, acting within its discretion, might have determined that the double-glazing regulation would have no significant effect on the environment.

The judgment is accordingly affirmed as to its declaration of the invalidity of the 2,600 degree-day double-glazing regulation. The judg-

ment as to the 3,500 degree-day transitional standard, declared invalid not for the failure of the Commission to prepare an EIR but on the fairness grounds discussed in part (1) of this opinion, is, however, reversed for the reasons stated there.

(3)

The Commission contends that the trial court erred in taking evidence additional to the administrative record.

In *Building Code Action* v. *Energy Resources Conservation & Dev. Com., supra,* 88 Cal.App.3d 913, 921, we held that Public Resources Code section 25901 governs review of the Commission's determinations, whether quasi-legislative or quasi-judicial. We noted that review of quasi-legislative action is ordinarily "traditional mandamus review" (88 Cal.App.3d, at p. 920) which does not "permit the introduction of new evidence." (*Brock* v. *Superior Court* (1952) 109 Cal.App.2d 594, 607 [241 P.2d 283]), and that review of such action which did permit the introduction of evidence not considered by the Commission would raise the constitutional question of separation of powers. (88 Cal.App.3d at p. 921, fn. 10.)

We did not decide the issue there nor need we do so here. Because we hold here that the Commission did not fail to provide a full and fair hearing and so reverse the trial court's holding to the contrary, the fact that the trial court permitted in evidence purporting to show procedural irregularity becomes irrelevant to the disposition of the case.

The judgment is reversed as to the determination that the regulations are invalid because adopted according to an unlawful or unfair procedure and affirmed as to the determination that the 2,600 degree-day double-glazing regulation is invalid and must be set aside.

White, P. J., and Scott, J., concurred.

A petition for a rehearing was denied March 27, 1980, and the opinion was modified to read as printed above. Respondents' petition for a hearing by the Supreme Court was denied May 21, 1980.