[L.A. No. 31585. Dec. 17, 1984.]

WESTERN OIL AND GAS ASSOCIATION et al.,
Plaintiffs and Respondents, v.
AIR RESOURCES BOARD et al., Defendants and Appellants.

504

■■■■■■■■■■■■■■

■■■■■■■■■■■■■■

**COUNSEL**

George Deukmejian, Attorney General, R. H. Connett, Assistant Attorney General, and Joel S. Moskowitz, Deputy Attorney General, for Defendants and Appellants.

John F. Powell, Richard W. Grieves, Laurence G. Chaset, Joseph J. Brecher, Nicholas C. Arguimbau, Michael D. Mason, Abby Ginzberg, Carlyle W. Hall, Jr., and Michael S. Gendler as Amici Curiae on behalf of Defendants and Appellants.

McCutchen, Black, Verleger & Shea, Philip K. Verleger, Jack D. Fudge, Gregory R. McClintock and Michael L. Hickok for Plaintiffs and Respondents.

Ronald A. Zumbrun, John H. Findley and Anthony T. Caso as Amici Curiae on behalf of Plaintiffs and Respondents.

**OPINION**

**GRODIN, J.**—This case presents issues of first impression under the Mulford-Carrell Air Resources Act (Health & Saf. Code, § 39000 et seq.) which created the State Air Resources Board (Board) and directed it to adopt standards of ambient air quality "for each air basin in consideration of the public health, safety, and welfare, including, but not limited to, health, illness, irritation to the senses, aesthetic value, interference with visibility, and effects on the economy." (§ 39606, subd. (b).)[1] Standards relating to health effects are required to be "based upon the recommendations of the

---

[1]At all times pertinent to this case, section 39606 provided: "The state board shall: [¶] (a) Based upon similar meteorological and geographic conditions and consideration for political boundary lines whenever practicable, divide the state into air basins to fulfill the purposes of this division. [¶] (b) Adopt standards of ambient air quality for each air basin in consideration of the public health, safety, and welfare, including, but not limited to, health, illness, irritation to the senses, aesthetic value, interference with visibility, and effects on the economy. These standards may vary from one air basin to another. Standards relating to health effects shall be based upon the recommendations of the State Department of Health."

Unless otherwise indicated, all statutory references are to the Health and Safety Code.

[health department]." (*Ibid.*)[2] Nine oil companies and two of their trade associations (plaintiffs) brought this action, contending that certain standards established by Board regulations were invalid because the standards were not based upon the health department's recommendations as the statute requires, the Board refused to consider the economic effects of the regulations, the standards lacked evidentiary support, and the manner of their adoption denied plaintiffs due process of law. The trial court, agreeing with these contentions, found the regulations invalid, and the Board has appealed from the ensuing judgment.

We have reached the following conclusions: The Board, which lacked medical expertise in its membership, was not authorized to reject health department recommendations as to the health effects of air pollution. However, while the Board was required to consider the department's recommendations as to health effects, it was not required to adopt the department's recommended air pollution levels as California's ambient air quality standards. The Board must evaluate a number of additional factors in establishing its standards, and, because of the grave health risks posed by air pollution, the Board may incorporate "margins of safety" and thus adopt air standards higher than those recommended by the health department. In light of these considerations, the record does not establish that the Board rejected the department's recommendations here.

The Legislature has not required the Board, in setting ambient air quality standards, to consider the effects of those standards on the economy. The economic consequences of air quality control regulation, including the impact of such regulation upon the jobs of employees in regulated industries, are indeed important and must be taken into account. It appears, however, that the Legislature intended that this responsibility should lie with the local and regional enforcement authorities, rather than the state Board. Therefore, the trial court's conclusion that the Board violated its statutory mandate in refusing to consider evidence of the potential economic effects of its proposed regulations was erroneous. Furthermore, substantial evidence supported the standards adopted, and the procedures followed were fair. Accordingly, we reverse the judgment of the trial court.

## I.

### PROCEDURAL HISTORY, STATUTORY BACKGROUND, AND JUDICIAL REVIEW IN GENERAL

The Board is mandated by statute to adopt standards of ambient air quality. Two separate proceedings, adopting standards for sulfates and for sulfur dioxide, are at issue here.

---

[2]The present State Department of Health Services and its predecessors will be referred to herein as the health department or the department.

The Board adopted the challenged sulfates standard, of 25 micrograms of sulfates per cubic meter of air, at the conclusion of a public hearing in February 1976. The Board adopted the sulfur dioxide standard in June 1977 after a public hearing held in April. This standard was modified, in respects not here material, in October 1977. The Board adopted a "combination" standard of 0.05 parts per million (ppm) sulfur dioxide in the presence of oxidant (ozone) in excess of the state standard for oxidant; or in combination with suspended particulate matter in excess of the state standard for particulates.[3]

In February 1978, nine oil companies and two trade associations filed a complaint challenging these standards. As ultimately amended, the complaint sought writs of mandate commanding the Board to rescind its resolutions adopting the standards.

By stipulation of the parties, oral argument was held before retired Judge Eugene E. Sax, acting as judge pro tempore of Los Angeles County Superior Court. Judge Sax decided in favor of the oil companies and ordered the issuance of the requested writs of mandate in December 1980.

The Board appeals from this judgment.

The Board was established by the Mulford-Carrell Air Resources Act. (Stats. 1967, ch. 1545, § 5, p. 3680.) In adopting the act, the Legislature manifested its determination to mobilize our state resources to establish an intensive and coordinated effort to combat the problems of air pollution. In the declaration of policy which prefaces the act's substantive provisions, the Legislature asserted the "physical environment is being degraded by the waste and refuse of civilization polluting the atmosphere, thereby creating a situation which is detrimental to the health, safety, welfare, and sense of well-being of the people of California." (Former § 39010; present § 39000.) The Legislature further declared: "It is necessary to provide a means for an intensive coordinated state, regional, and local effort to combat the problems of air pollution within the various air basins in the state . . . and to provide for state authority to establish ambient air quality standards that could vary from basin to basin . . . ." (Former § 39011; cf. present § 39001.) And, "[i]t is imperative to provide a single state agency for

---

[3]In 1975, the Board had repealed the former sulfur dioxide standard of 0.10 ppm and adopted a more stringent standard of 0.04 ppm. Western Oil and Gas Association (WOGA), one of the plaintiffs in this action, challenged this standard in court. At the time of the adoption of the sulfur dioxide standard at issue here, the Board was prohibited from implementing the 0.04 ppm standard by a preliminary injunction issued by the Sacramento County Superior Court in October 1976. The lawsuit challenging the 0.04 ppm standard has since been voluntarily dismissed as moot.

administration, research, establishment of standards, and the coordination of air conservation activities carried on within the state." (Former § 39013.)

At the time of the proceedings at issue in this case, the statute provided for a Board composed of five members, two with training and experience in automotive engineering or closely related fields, two with training and experience in chemistry, meteorology, or related scientific fields, including agriculture, or law, and one member who qualified under the above requirements or had administrative experience in the field of air pollution control. (Former § 39510.)[4]

The statutes direct the Board to divide the state into air basins and to "[a]dopt standards of ambient air quality for each air basin in consideration of the public health, safety, and welfare, including, but not limited to, health, illness, irritation to the senses, aesthetic value, interference with visibility, and effects on the economy. These standards may vary from one air basin to another. Standards relating to health effects shall be based upon the recommendations of the [health department]." (§ 39606, subd. (b).)

It is the duty of local and regional air quality districts to promulgate and implement rules and regulations reasonably assuring achievement and maintenance of the state standards. (§§ 40000-40002; *Stauffer Chemical Co.* v. *Air Resources Board* (1982) 128 Cal.App.3d 789, 792-793 [180 Cal.Rptr. 550].)

■ The proceedings of the Board are quasi-legislative in nature, and the courts exercise limited review out of deference to separation of powers between the Legislature and the judiciary, and to the presumed expertise of the agency within the scope of its authority. A reviewing court will determine whether the agency acted within the scope of its delegated authority, whether it employed fair procedures, and whether its action is arbitrary, capricious, or lacking in evidentiary support. (*Industrial Welfare Com.* v. *Superior Court* (1980) 27 Cal.3d 690, 702 [166 Cal.Rptr. 331, 613 P.2d 579], cert. den., 449 U.S. 1029 [66 L.Ed.2d 492, 101 S.Ct. 602]; *California Hotel & Motel Assn.* v. *Industrial Welfare Com.* (1979) 25 Cal.3d 200, 212 [157 Cal.Rptr. 840, 599 P.2d 31].) A reviewing court will not substitute its policy judgment for the agency's in the absence of an arbitrary decision (*ibid.*), and in the absence of statutory requirement, the agency need not

---

[4]Section 39510 was amended in 1981 to expand the Board membership to seven members and to change the qualifications. One of the members is now required to "be a physician and surgeon or an authority on health effects of air pollution." (Stats. 1981, ch. 982, § 1, p. 3809.)

prepare findings in support of its legislative decision (*Stauffer Chemical Co. v. Air Resources Board, supra,* 128 Cal.App.3d 789, 794).

## II.

### THE DEPARTMENT OF HEALTH SERVICES RECOMMENDATIONS

In the proceeding to establish a standard for sulfates, the health department recommended and the Board adopted a standard of 25 micrograms of sulfate per cubic meter of air during a 24-hour period. In the sulfur dioxide proceeding, the health department recommended retention of the existing standard of .04 ppm of air for a 24-hour period. Instead the Board adopted a standard of .05 ppm for a 24-hour period in which there were elevated levels of oxidants or particulates.

The trial court concluded that the Board is statutorily required to base its standards upon the health department's recommendations. The court further concluded that, in both proceedings, the Board had failed to follow this statutory mandate. While we agree that section 39606 requires the Board to base its standards on health department recommendations, the evidence does not support the trial court's conclusion that the Board failed to do so.

The trial court concluded that section 39606 should be interpreted literally and that a "deviation from the health department recommendations is not, in my opinion, a *basing* of the standards thereon." (Italics in original.) The court pointed out that there was no requirement of medical expertise for Board membership and reasoned that the assessment of the effects of air pollution upon health requires medical expertise and that the health department, whose members are highly qualified medical doctors, should make such determinations.

The Board maintains that, while the statute requires standards relating to health effects to be based on the recommendations of the health department, this does not mean that the standard must be identical to the recommendation. Rather, the recommendation is the starting point and based on the evidence received at its hearing, the Board may depart from the recommendation. Urging that the health department should not be viewed as the only body with medical expertise, the Board points out that it is designated to hold the hearing (§ 39601), and is authorized to conduct studies and evaluate the effects of air pollution upon human life and to coordinate and collect research data on air pollution (§§ 39701, 39703). The Board reasons that there is not much point in its holding the hearing and acting as the coordinator of research if it is ultimately bound by the health department's recommendations.

■ Words such as "recommends" and "recommendations" are used in the codes both in a mandatory and advisory sense, and the determination of the legislative intention depends upon the context in which the word is used. (*Hough* v. *McCarthy* (1960) 54 Cal.2d 273, 280 [5 Cal.Rptr. 668, 353 P.2d 276].) When, as here, "recommendations" is coupled with the mandatory "shall" (Gov. Code, § 14; *Governing Board* v. *Felt* (1976) 55 Cal.App.3d 156, 162 [127 Cal.Rptr. 381]), there is a strong indication that "recommendations" is used in a mandatory sense. (See *Hough* v. *McCarthy, supra,* 54 Cal.2d 273, 280, fn. 5; *In re Ferguson* (1965) 233 Cal.App.2d 79, 81 [43 Cal.Rptr. 325].)

■ Other provisions and the legislative history both indicate that health department recommendations are to be binding as to health effects. The provision stating that standards as to health effects "shall be based upon" department recommendations follows a sentence enumerating matters to be considered by the Board. Prior to 1967, the health department was vested with the authority to adopt ambient air quality standards. (Former § 426.1.) In establishing the Board, the Legislature provided that it should consider a number of factors in setting standards including but not limited to health, and that standards relating to health effects "shall be based on the recommendations" of the health department. (Former § 39051, subd. (b), present § 39606, subd. (b).) As the trial judge pointed out, physicians and surgeons did not at this time qualify for membership on the Board. The health department, on the other hand, employed qualified health experts. Studies examining the relationship of air pollution to disease involve complex matters, and it is apparent from the record that many studies are of questionable validity. In these circumstances, there is little reason to conclude that the Legislature intended to permit a Board lacking the expertise necessary to evaluate these studies to reject recommendations by the health department as to health effects.

The fact that the Board is the agency empowered to conduct the hearing on standards does not persuade us that it may reject health department recommendations. Under section 39606, a number of matters in addition to health effects are to be considered in adopting standards, and it is reasonable for the Legislature to have provided for a single hearing in which all factors, including health effects, would be addressed.

Neither is the Board's reliance on its duty to coordinate and collect research on air pollution persuasive in considering whether it may reject health department recommendations. Section 39701 mentions the effects of air pollution on human health only as one of a long list of subjects to be included in research projects. The legislative determination that all air pollution research should be conducted and collected by a single state agency

does not vitiate the specific legislative directive that standards relating to health effects be based upon health department recommendations.

We conclude that the Board must follow health department recommendations for standards relating to health effects. However, this does not mean that the standards of ambient air quality adopted by the Board must be identical to those recommended by the department. Section 39606 enumerates several matters the Board must consider in addition to health effects, and the Board must take all these factors into account in determining the standards of ambient air quality. What the Board may not do is to substitute its judgment for that of the health department in determining health effects.

■■■ The evidence supports the conclusion that the Board followed the recommendations of the health department in each of the proceedings at issue here.

A. *Sulfates Proceeding*

The health department recommended a standard of 25 micrograms per cubic meter of air during a 24-hour period; the Board adopted that exact standard. In concluding that the Board did not follow the department recommendation, the trial court looked beyond the ultimate recommendation to the report upon which it was based. Relying upon this background data, the court apparently concluded that the standard adopted did not accurately reflect the health department's recommendation on two different bases. First, the recommendation—viewed in light of the report—was for 25 micrograms *in the presence of elevated oxidant pollution* such as occurs in the South Coast Air Basin. Second, the information upon which the report relied was based on a study of industrial sulfuric acid levels rather than sulfates.

The record in the sulfate hearing clearly establishes that the current state of scientific knowledge on the health effects of air pollution does not permit the establishment of a precise ambient air quality standard such that immediately above the standard deleterious effects are certain to occur and immediately below it deleterious effects are certain not to occur. Instead, the available information permits only approximations of safe sulfate levels.[5]

---

[5]Three basic groups of data are used to determine the health effects of air pollution: (1) human and animal toxicological laboratory studies, (2) occupational health data, and (3) epidemiological studies, i.e., community-wide studies of pollution-caused diseases in areas where pollutants have been measured. Each type of data has built-in limitations. The first, which measures human response to known dosages of pollutants, has historically been confined to healthy rather than sensitive persons, short-term acute exposures rather than chronic exposures, and—until very recently—single pollutants rather than combinations. Occupational health studies involve intermittent 8-hour exposures of an essentially healthy group, workers, rather than continuous exposure for 24 hours of the community at large, including sensitive groups such as children and the elderly. Epidemiological studies reflect community-

The department's report was based, in part, on toxicological studies of healthy persons exposed to sulfuric acid mist for short periods of time. Health department doctors extrapolated from these studies to arrive at an estimate of the adverse health effects to be expected upon longer term exposures. The doctors also adjusted the figures for sensitive subjects. In addition, the department examined occupational standards for exposure to sulfuric acid mist over an eight-hour day. These standards, too, were extrapolated to reflect a 24-hour day and were adjusted to protect more sensitive persons. The department also considered epidemiological study results showing that sulfates in the air could aggravate the symptoms of persons with respiratory diseases and affect the respiratory function of growing children. Most of these studies were conducted when oxidant levels were also elevated. There was evidence that almost all the sulfates in California air are harmful and that sulfuric acid is the most harmful sulfate compound.

The health department's background report pointed out: that the presence of certain sulfates in the air is very dangerous to humans while other sulfate compounds are not harmful; that the Environmental Protection Agency had concluded that development of data and information necessary for a regulatory program could require several years (although the department opined that sufficient scientific information would be available within 15 months); and that the presence of more than 25 micrograms per cubic meter coupled with exposure to elevated oxidant levels had been shown to provide a likelihood of significant harm to the respiratory system. The department stated that because of the urgent need to avoid large summer increases in sulfate levels, regulatory action should be undertaken in the interim. Doctors who prepared the department report testified at the Board hearing as to the contents of the report.

We conclude that the health department's recommended standard of 25 micrograms per cubic meter cannot be impeached. The health danger from sulfates was clearly established. While the scientific studies did not permit detailed analyses as to either permissible sulfate levels or methods of meeting the danger, there was a risk that if no steps were taken, substantial health damage would occur. The department made its recommendation on the basis of the best evidence available to it. (See *American Textile Mfrs. Inst.* v. *Donovan* (1981) 452 U.S. 490, 528-529 [69 L.Ed.2d 185, 213-214,

wide response to pollutants under ambient conditions, but because the conditions are neither controlled nor measured under laboratory conditions, no precise dose-response relationship can be determined. In addition to studies, the Board received expert testimony, including that of department officials, explaining the meaning of the various studies. These experts provided recommendations as to what standard should be adopted. To relate the first two groups of data to a standard for the community, the department experts extrapolated the figures in the report.

101 S.Ct. 2478].) We can ask no more. When a grave risk is identified, *substantial decisions must be made to reduce the risk even though our scientific knowledge is insufficient to determine whether the regulation chosen is the best method of meeting the risk.*

Nor was the department required to recommend a combined standard of 25 micrograms *in the presence of elevated oxidant pollution.* While the epidemiological studies showing adverse health effects from sulfates may also have involved elevated oxidant levels, the evidence showed that sulfates alone produce deleterious health effects. The 25-microgram figure was based not only on the epidemiological studies but also on extrapolations from toxicological studies and occupational health data, which did not involve elevated oxidant levels. Neither the information contained in the report nor the other evidence received at the hearing established that, in the absence of elevated levels of oxidant, sulfate pollution above the 25-microgram standard is safe.

The toxicological studies and the occupational health data were based on studies of sulfuric acid, which is the most harmful of sulfate compounds. But the basis of those studies did not preclude the department's reliance upon them, since other evidence showed that most sulfates occurring in California air are dangerous and that the department's expert opinions were based on judgments as to the sulfate levels in California air. Because sulfates were shown to be dangerous, even absent elevated oxidant levels, the department could reasonably conclude that a standard should be adopted for sulfates alone and that the epidemiological, toxicological and occupational data warranted fixing the level at 25 micrograms. Moreover, it was shown that elevated levels of oxidants were occurring in our state.

The trial court's criticisms of the department's use of the data, while supported in a number of respects by expert testimony at the hearing, is in essence an attack on the testimony of those doctors who supported the report. These doctors gave expert opinions as to why the data warranted the standard adopted. The trial court's criticisms, at most, reflect the fact that different conclusions can be drawn from the available data. Accordingly, we must accept the health department's determination that a single standard is appropriate for sulfates and that the data warrants a 25-microgram standard.

The standard adopted by the Board was the standard recommended by the health department. The record supports this standard. Further study may someday establish that the sulfates standard should have been fixed at a different level or that the sulfates standard should have been a combined standard. However, having been informed of a major health risk, the Board

is statutorily required to act. ■ Courts may not reject the Board's analysis of the available information when that analysis is based upon expert testimony supporting the validity of air pollution studies and interpreting their results. Courts may not substitute their judgment for that of the experts as to the import of the available information. The choice between conflicting expert analyses is for the Board, not the courts. ■ The trial court's independent evaluation of the underlying evidence was unnecessary and erroneous.

### B. *Sulfur Dioxide Proceeding*

The health department concluded: that sulfur dioxide alone is not likely to produce significant health effects within the range of likely exposures, but that sulfur dioxide had produced effects in combination with particulate matter and could produce effects in combination with photochemical oxidants; that no report had indicated health effects at concentrations less than .10 ppm averaged over 24 hours; and that, at slightly greater concentrations, long-term exposures were associated with the development and exacerbation of chronic respiratory conditions. The department report concluded it was reasonable to apply a margin of safety in setting an air quality objective. However, the report found there was no scientific basis for establishing a particular margin of safety below the level of the .10 standard, and that the margin of safety was a value judgment or a policy matter for the Board. Nonetheless, the department stated "the present air quality standard of .04 ppm $SO_2$ for 24 hours average, is reasonable in light of what is known about human health effects and with a margin of safety as determined by the Air Resources Board."[6]

The Board adopted a standard for ambient air of .05 ppm of air for a 24-hour period in the presence of an excessive level of oxidants or particulates. What level of oxidants or particulates was "excessive" was to be determined by reference to existing state standards for these pollutants. In other words, the sulfur dioxide standard would not be exceeded unless the 24-hour average for sulfur dioxide exceeded .05 ppm *and* the state standard for particulate matter or oxidants was also met or exceeded. The trial court concluded that the Board did not have authority to include a safety factor and that in any event the record did not support the safety factor which the Board adopted.

Concluding that the Board did not have authority to impose a safety factor, the trial court pointed out that the federal Clean Air Act expressly

---

[6]In 1969, the Board adopted a .04 standard, in 1974 a .10 standard, and in 1975 a .04 standard. After the latter standard was enjoined by the Sacramento County Superior Court, the Board noticed the instant hearing. The Environmental Protection Agency standard is .14.

mandated an adequate margin of safety, that the Legislature must have been aware of the Clean Air Act provision but did not mention a safety margin, and that to adopt the Board's position that it could establish a safety margin without regard to its economic effect would frustrate the legislative purpose of protecting public health without destroying industry.

The language of section 39606, directing the Board to adopt standards in consideration of the public health, safety, and welfare, reflects the breadth of matters to be considered by the Board. Considerations of health and safety necessarily include safety margins where appropriate. The Board's duty includes the protection of the health of the citizens of the state (§§ 39000, 39001), not merely the correction of unhealthy conditions. The Board therefore should not be required to wait until substantial adverse health effects are scientifically verified before adopting appropriate standards. Rather, the Board must establish its standards based on the available scientific evidence in a rapidly developing area of research. It may not ignore the possibility that further research may reveal that substantial health effects occur at lower levels of pollution than indicated by present studies.

The provisions of sections 39000, 39001 and 39606 were adopted prior to the federal Clean Air Act. Although the statutes were amended subsequent to the act, the fact that the Clean Air Act, unlike our statute, specifically mentions safety margins is not entitled to weight in view of the broad language of our statutes.

The evidence supports the safety factor chosen by the Board. The health department report recommended application of a "margin of safety" to the .10 ppm level and stated that the existing standard of .04 ppm was reasonable. A number of doctors urged adoption of a safety factor. The staff report summarized the practices of a number of federal agencies in imposing safety factors, including one in which the National Academy of Sciences recommended a standard for nitrogen oxide of one-half the lowest level at which adverse health effects are observed. The trial judge concluded that this evidence should be disregarded because it did not deal with sulfur dioxide. But the staff report, the department report—which itself is evidence—and the expert testimony together provide a sufficient evidentiary basis for the safety factor adopted here.

### III.

#### EFFECTS ON THE ECONOMY

Plaintiff WOGA presented a report at the sulfur dioxide hearing which purported to establish that the industry's cost of compliance with the pro-

posed .04 ppm sulfur dioxide standard would be between $38.1 billion and $44.6 billion for the period from 1977 to 2000. The Board, noting that the report overstated compliance costs and made assumptions about increases in population and energy consumption that were not necessarily correct, concluded that the evidence presented by WOGA was "limited, self-serving and unreliable." It proceeded to adopt the standard without making specific findings as to the likely effect of the standard upon the economy. At the sulfates hearing, the Board refused to hear any evidence concerning the effects of air quality standards upon the economy.

■■■ The trial court ruled that the Board could not discharge its statutory duty merely by considering and criticizing whatever economic data might be submitted. Rather, in the court's view, the Board itself "has the duty of marshalling and presenting all available evidence upon this issue." The court reasoned, "if the Legislature did not want [the Board] to consider effects on the economy in carrying out the Legislature's directive, it could simply authorize [the Board] to adopt standards prohibiting the presence of all deleterious pollutants in the atmosphere. Such Draconian measures would certainly give complete protection to the health of all human beings but at the same time it would be disastrous to our economy." The Board urges that the "effects on the economy" referred to in section 39606 are the effects of air pollution, and that the statute contains other safeguards against "disastrous" economic effects occurring from application of the standards.

We agree with the trial court that sound policy requires that the economic consequences of pollution control regulations must be taken into account. Our disagreement is not as to *whether* the Legislature intended these economic consequences to be considered, but rather *when* and *how*. We believe that the Legislature intended local and regional authorities, rather than the Board, to consider the economic consequences of compliance with the air quality standards.

The sort of cost-benefit analysis[7] apparently contemplated by the trial court would require that the Board assess, not only the out-of-pocket costs

---

[7]"Cost-benefit analysis derives from simple profit and loss accounting traditionally practiced by business organizations. Cost-benefit 'analysis involves translating the attribute performances of alternatives into dollar quantities. The favorable attribute performances are added together to become the benefits. The sum of the unfavorable attribute performances is the cost. Thus, the cost-benefit analysis can be viewed as a process of deriving dollar values for each entry in a performance matrix and aggregating all of the performances into one attribute, either net benefits (benefit minus cost) or a benefit to cost ratio.' A decision is justifiable when net benefit is positive or a benefit-to-cost ratio is greater than one." (Baram, *Cost-Benefit Analysis: An Inadequate Basis for Health, Safety, and Environmental Regulatory Decisionmaking* (1980) 8 Ecology L.Q. 473, 477-478, fn. omitted.)

to the regulated industry, but all the other potential economic consequences of the standard upon the economy of the state. As the Board observed in its findings, these could include positive economic benefits such as expansion of the pollution control industry, protection of tourism, and avoidance of individual and corporate relocations outside the state. Then, if the net effect upon the economy was deemed to be negative, that effect would somehow have to be weighed against such intangible values as long life, good health, and clean air.

We do not find evidence in the statute or in its history that the Legislature intended to impose upon the Board such a formidable task. Rather, it appears that the Legislature itself made the preliminary policy decision that clean air—i.e., air which does not contain pollutants at levels which cause "undesirable effects"—is a goal worth pursuing, leaving it to the Board to articulate that goal, and to local authorities to enforce it with due regard for the avoidance of unduly harsh economic impact upon the regulated industries. This is apparent from the language of the statute, federal court interpretations of the cognate Clean Air Act, contemporaneous administrative construction, and the structure and history of the California statute.

Section 39606, subdivision (b) requires the state Board to "[a]dopt standards of ambient air quality for each air basin in consideration of the public health, safety, and welfare, *including, but not limited to, health, illness, irritation to the senses, aesthetic value, interference with visibility, and effects on the economy.*" (Italics added.) It is apparent that the Board's *standards* cannot themselves cause illness, irritate the senses, or interfere with visibility; neither can they be aesthetically displeasing. Thus, as to the enumerated factors other than "effects on the economy," at least, it is clear that the Legislature intended to focus the Board's attention on the effects of *pollution.*[8]

---

[8]A consideration of the massive effects of air pollution on the economy serves to bring the Legislature's intent into even clearer focus. As the District of Columbia Circuit has observed, Congress'· concern with pollution "was not confined to its adverse effects on humans, but extended as well to its impact on the economy. The terms 'public health and welfare' thus encompass economic values, but only to reflect the *economic costs of pollution,* not the social costs of pollution control. This is evident in every context in which the terms appear." (*Motor and Equipment Mfrs. Ass'n, Inc.* v. *E. P. A.* (D.C. Cir. 1979) 627 F.2d 1095, 1117-1118, cert. den. (1980) 446 U.S. 952 [64 L.Ed.2d 808, 100 S.Ct. 2917] [italics added].) The court quoted a House report which cited the staggeringly large economic effects of air pollution, including increased incidence of illness, premature death, increased expenditures for health care and insurance, loss of tax revenues, damage to real estate and crops and other vegetation, and possible huge economic losses for tourist-related industries. "While quantifications of these losses is obviously difficult, some estimates range as high as $16.1 billion annually (in 1968 dollars)." (*Id.,* at p. 1118, fn. 47.) Another source notes estimated costs of $100 million a year to paint steel structures damaged by air pollution; $500 million a year for crop and livestock damage; and $800 million a year for dyeing of fabrics soiled by air pollution. (Crocker, *On Air Pollution Control Instruments* (1972) 5 Loyola L.A. L.Rev. 280, 281, fn. 7.)

That being the case, it does not seem likely that the Legislature intended to require the Board, when considering economic effects, suddenly to shift its focus from pollution to standards. As a matter of common sense, if the Legislature intended such a shift in focus it would have signaled that intent more clearly.

Plaintiffs urge us to rely upon the preliminary phrase "public health, safety, and welfare." "Welfare" includes economic welfare, they argue, and thus reflects legislative concern with the economic effects of the Board's standards.

That the term "welfare" was intended to include economic welfare is possible, but that it was intended to refer to the consequences of the Board's standards seems unlikely. The same term is used in the cognate federal Clean Air Act (42 U.S.C. § 7401 et seq.), where it is expressly defined to include "effects on economic values" (42 U.S.C. § 7602(h)), yet it has been held that this definition "does not . . . include the cost of compliance with the air quality standards. It only refers to the economic costs of pollution." (*Lead Industries Ass'n* v. *Environmental Protection* (D.C. Cir. 1980) 647 F.2d 1130, 1148, fn. 36, cert. den., 449 U.S. 1042 [66 L.Ed.2d 503, 101 S.Ct. 621]; see also *Motor and Equipment Mfrs. Ass'n, Inc.* v. *E. P. A., supra,* 627 F.2d at pp. 1117-1118.) We see no reason to interpret this state's statute differently. Section 39000 sets forth the legislative declaration and findings "that the people of the State of California have a primary interest in the quality of the physical environment in which they live, and that this physical environment is being degraded by the waste and refuse of civilization polluting the atmosphere, *thereby creating a situation which is detrimental to the health, safety, welfare,* and sense of well-being of the people of California." (Italics added.) The phrase "public health, safety, and welfare" in section 39606 is but a repetition of that concern.

Federal courts, in concluding that the federal Clean Air Act does not require the administrator to consider the economic consequences of standards, have observed: "Where Congress intended the Administrator to be concerned about economic and technological feasibility, it expressly so provided." (*Lead Industries Ass'n* v. *Environmental Protection, supra,* 647 F.2d at p. 1148; see also, *Motor and Equipment Mfrs. Ass'n, Inc.* v. *E. P. A., supra,* 627 F.2d at p. 1118.) The same is true of California's statute. Addressing emission standards for new motor vehicles, section 43101 directs the Board to adopt and implement standards "which . . . the state board has found to be necessary and technologically feasible to carry out the purposes of this division. Prior to adopting such standards, the state board *shall consider the impact of such standards on the economy of the state,* including, but not limited to, their effect on motor vehicle fuel effi-

ciency." (Italics added.) Section 43101 is evidence that when the Legislature wants the Board to consider the economic effects of its standards, it knows how to say so in plain English. (See also §§ 43630, subd. (c), 44021.)

The Board's position is also supported by long-established administrative interpretation. In title 17, California Administrative Code, section 70101 (enacted in 1969, reg. 69, No. 52), the Air Resources Board has set forth its interpretation of section 39606: "The objective of ambient air quality standards is to provide a basis for preventing or abating the effects of air pollution, including effects on health, esthetics and economy."[9] The Board thus has set forth its view that section 39606's "effects on the economy" clause refers to the effect of pollution on the economy. ■ As a contemporaneous construction of a statute by an administrative agency charged with its enforcement, the Board's view is entitled to great weight (*Rivera* v. *City of Fresno* (1971) 6 Cal.3d 132, 140 [98 Cal.Rptr. 281, 490 P.2d 793]). The reenactment of the critical subdivision (b) language essentially without change in 1975 (Stats. 1975, ch. 957, § 12, p. 2149, replacing former § 39051 with present § 39606) constitutes at least some evidence that the Board's view is acceptable to the Legislature (e.g., *Action Trailer Sales, Inc.* v. *State Bd. of Equalization* (1975) 54 Cal.App.3d 125, 133-134 [126 Cal.Rptr. 339]).

■ Finally, a review of pertinent aspects of the history of California air pollution legislation suggests that the Legislature intended *local and regional* authorities, rather than the state Board, to consider the economic consequences of air quality regulations.

The original California air pollution control law was enacted in 1947 (Stats. 1947, ch. 632, p. 1640 et seq., div. 20, ch. 2, § 24198*ff.*) This legislation authorized the creation of an air pollution control district in each county and established certain statewide emissions standards. Local authorities, however, were authorized to adopt stricter standards and given the responsibility to enforce both state and local standards. This legislation authorized local districts to adopt regulations to reduce air contaminants wher-

---

[9]Section 70101 of the California Administrative Code, title 17, does not actually cite section 39606 as authority. Rather, it cites sections 39600, 39601, subdivision (a), and 39602, discussing the general powers and duties of the Board. Section 39601, subdivision (a) is the enabling statute which empowers the Board to adopt standards. We find this omission to be without significance. The language of California Administrative Code, title 17, section 70101 obviously interprets the Board's mandate with respect to the adoption of ambient air quality standards under section 39606. In addition California Administrative Code, title 17, section 70200 in which the ambient air standards actually adopted pursuant to section 39606 are published, also cites section 39601 rather than 39606.

ever they caused discomfort or property damage to "a substantial number of inhabitants." (Former § 24262.)

Article 5 of this law addressed variances. Under its provisions, hearing boards of local districts could permit the discharge of greater amounts of contaminants than otherwise allowed by either the statewide standards or the local rules. Former section 24297 of the variance provisions is particularly instructive in the present context:

"In determining under what conditions and to what extent a variance from said requirements is necessary and will be permitted, the hearing board shall exercise a wide discretion in weighing the equities involved and the advantages and disadvantages to the residents of the district and to any lawful business, occupation or activity involved, resulting from requiring compliance with said requirements or resulting from granting a variance."

Thus, under these provisions, it is clear that local districts had the authority to permit noncompliance with both state and local standards in the interests of equity. The language of former section 24297 strongly suggests that among the "equities involved" are the economic effects of compliance both upon local residents and upon local businesses and activities.[10]

When the Mulford-Carrell Air Resources Act was adopted in 1967, it took this statutory backdrop into account. Thus, former section 39102 provided that "[l]ocal and regional authorities have the primary responsibility for the control of air pollution except for the emissions from motor vehicles." (Stats. 1967, ch. 1545, p. 3681.) The act, therefore, presupposed the existence of functional local air pollution control boards operating under the authority of the 1947 statutes and that these local boards retained the broad discretion to grant variances as noted above.

Plaintiffs point out that the 1967 act created the Board and, in former section 39051, empowered the Board to adopt standards of ambient air quality throughout the state. In addition they note that, at the time of enactment, section 39313 of the act provided, "Every county district board shall adopt rules and regulations to control the sources of air pollution within the district *and shall comply with all the standards,* rules and regulations *set forth by the state board.*" (Italics added.)

Plaintiffs contend that this language demonstrates the Legislature's intent to require local districts strictly to comply with the Board's standards. Thus,

---

[10]This same legislative mandate of broad discretion to local and regional air pollution control districts has reappeared in every subsequent enactment of the pertinent air quality legislation and is embodied today in section 42354.

they argue, the act effectively revoked the districts' discretionary power to grant variances. Persuaded by this argument, the dissent reasons that local districts must remain in overall compliance with the state board's standards, even after granting variances.

We disagree. The provisions of the Mulford-Carrell Act are not unambiguous but, taken as a whole, they appear to indicate a continued legislative commitment to the discretionary enforcement powers of local and regional authorities.

As noted above, the act specifically provided that local and regional authorities have "primary responsibility" for control of nonvehicular air pollution. The act also specifically authorized the creation of regional boards to control air quality in multi-county basins. The powers and duties of these regional boards parallel those granted to the local districts under the 1947 legislation. Former section 39381 provided: "The regional district shall establish and execute an effective program for the reduction of air contaminants within the regional district and shall *enforce all orders, rules and regulations prescribed by the state board* relating to the sources of air pollution within its jurisdiction." (Italics added.) At the same time, section 39470 et seq. of the act specifically granted to the regional boards the same broad discretion to grant variances held by the local districts under the 1947 law.

The entire structure of the act thus indicates that the powers and duties of local and regional district boards are essentially the same. It is also explicit that the state board shall monitor the activities of both in the same way (former § 39054). Yet it is incontrovertible that the regional boards were *not* specifically required to comply with the Board's standards and that they had a broad discretion to grant variances in the interests of equity. In view of these observations, we cannot conclude that the Legislature intended to require the local boards to comply with the Board's standards while allowing regional boards to do otherwise.

Rather, the Mulford-Carrell Act, and specifically section 39313, is susceptible to another interpretation. While local and regional authorities may establish stricter standards than promulgated by the Board (former § 39057), the local and regional districts are required to adopt as a minimum the Board's standards and to promulgate rules and regulations to implement these standards (former §§ 39313, 39381). Nonetheless, local and regional boards have primary responsibility for enforcement of these standards (former § 39012) and may grant variances where equitable considerations indicate that strict compliance would be disadvantageous (former § 39476). The Board monitors the performance of local and regional boards, but

should only interfere if the "local or regional authority has not taken *reasonable action* to control emissions from nonvehicular sources . . . ." (Former § 39054, italics added.)

That the Legislature did not intend, in the Mulford-Carrell Act, to revoke the traditional discretion of local boards is further suggested by amendments enacted in 1975. Former section 39313 was amended to read, in pertinent part: "the districts shall adopt and enforce rules and regulations which assure that *reasonable provision is made to achieve and maintain the state ambient air quality standards* for the area under their jurisdiction, and shall enforce all applicable provisions of state law." (Stats. 1975, ch. 957, § 12, p. 2153, italics added.)[11]

We believe that, via this amendment, the Legislature intended to clarify the ambiguous provisions of former section 39313 and to specify that local and regional authorities retain the discretion to waive compliance with Board standards within reasonable limits. These limits are further clarified in the amended version of the variance authority granted to local and regional hearing boards. Under section 42352, "No variance shall be granted unless the hearing board makes all of the following findings: [¶] (a) That the petition for a variance is, or will be, in violation of Section 41701 or of any rule, regulation, or order of the district. [¶] (b) That, due to conditions beyond the reasonable control of the petitioner, requiring compliance would result in either (1) an arbitrary or unreasonable taking of property, or (2) the practical closing and elimination of a lawful business. [¶] (c) That such closing or taking would be without a corresponding benefit in reducing air contaminants." (Added by Stats. 1975, ch. 957, § 12, p. 2185, amended by Stats. 1976, ch. 1063, § 42, p. 4717, eff. Sept. 21, 1976.)

The foregoing observations persuade us that the Legislature has traditionally viewed local and regional authorities as the primary enforcers of air quality regulations throughout the state and has vested in these authorities a broad discretion to grant reasonable variances to avoid the disastrous effects hypothesized by the trial court. The Board has, in fact, assured this court that, in several areas of the state where the costs of compliance would be unreasonable, local districts are not expected strictly to comply with Board-mandated standards.

This statutory interpretation is also logically appealing. Local and regional boards will be more familiar with local conditions, both environmental

---

[11]It should be noted also that the 1975 amendments address the powers and duties of "air pollution control districts," eliminating any differentiation between local and regional districts altogether.

and economic, than the Board. Adoption of local enforcement regulations must be preceded by public hearings at which all interested persons are afforded the opportunity to make written and oral presentations which the district is obligated to consider. (Gov. Code, § 11346.8, former § 11425.) Any person may apply to the local or regional hearing board for a variance from any district's rules and regulations. (§ 42350.)

Thus the districts are asked to evaluate the economic consequences of air quality regulation in specific local situations where concrete relevant evidence may be presented. By contrast, plaintiffs urge a statutory interpretation which would require the Board to attempt to weigh the hypothetical economic consequences of proposed standards on a statewide basis. The enormity of such a task could well paralyze the Board indefinitely, effectively frustrating its most fundamental steps toward the improvement of air quality. Such a result is completely at odds with the urgency inherent in the declaration of policy which prefaced the Mulford-Carrell Act. (Stats. 1967, ch. 1545, art. 2, p. 3681.)

In light of these considerations, we conclude that the Legislature did not intend to impose upon the Board the obligation to consider the economic consequences of the standards it proposes to adopt prior to their promulgation. The trial court's conclusion that the Board violated its duty in refusing to consider the potential effects of its proposed standards was erroneous.

We acknowledge that the statute is ambiguous, and that reasonable minds may differ as to whether the Legislature intended economic consequences to be taken into account at the state or local levels. Indeed, it may be that the purposes of the statute could better be implemented by some form of coordinated approach at both state and local levels. Further clarification or accommodation will have to come, however, from the legislative branch.

## IV.

### PROCEDURAL ISSUES

The trial court invalidated the challenged sulfur dioxide and sulfates standards, in part, because they were the product of unfair administrative hearings. The Board, relying upon the decision of the United States Supreme Court in *Vermont Yankee Nuclear Power Corp.* v. *NRDC* (1978) 435 U.S. 519 [55 L.Ed.2d 460, 98 S.Ct. 1197], urges us to rule that so long as an administrative agency's procedures comply with the requirements of the Administrative Procedure Act (formerly Gov. Code, § 11370 et seq., now Gov. Code, § 11340 et seq.), the agency's decisions are immune from ju-

dicial review on grounds of procedural fairness. However, we need not reach this question in order to decide the case before us. We conclude that the Board complied with the requirements of the Administrative Procedure Act and because the procedures followed here were sufficient to promote the dual objectives of the act—meaningful public participation and effective judicial review (see *California Assn. of Nursing Homes etc., Inc.* v. *Williams* (1970) 4 Cal.App.3d 800, 810-812 [84 Cal.Rptr. 590])—we conclude that they were fair as that term is used in *California Hotel & Motel Assn.* v. *Industrial Welfare Com.* (1979) 25 Cal.3d 200, 212 [157 Cal.Rptr. 840, 599 P.2d 31].[12]

## A. *The Sulfates Hearing*

█ The trial court found that the Board failed to follow fair procedures because interested parties did not have a fair or reasonable opportunity to respond to a report prepared prior to the hearing by the Air Resources Board staff.

The staff report including its 6 appendices comprises 113 pages, lists 113 references, and contains tables, maps, diagrams, and several complex mathematical formulae and chemical testing and measurement procedures. The report was mailed by the Board to interested parties on February 11, the day before a legal holiday, for a public hearing on February 20. The court found that interested parties had the report for only four working days before the hearing. A witness testifying on behalf of the Southern California Air Pollution Control District and a representative of General Motors each sought 30-day continuances to comment on the report, stating that they had not had adequate time to review the report. The requests for continuance were denied.

It is not claimed that the procedure was constitutionally deficient. Since the Board was acting in a "quasi-legislative" capacity, no constitutional issue of due process is presented. (*Horn* v. *County of Ventura* (1979) 24 Cal.3d 605 [156 Cal.Rptr. 718, 596 P.2d 1134].) The Board asserts that it complied with the Administrative Procedure Act as required by section 39601 and that the procedure followed was fair.[13] We agree.

---

[12]Whether bare compliance with the requirements of the Administrative Procedure Act is always sufficient to immunize quasi-legislative hearings from judicial review on procedural fairness grounds is a question beyond the scope of this case.

[13]At the time involved in the instant case, there was no statutory requirement specifically requiring the agency to make available to interested parties its staff reports or similar documents. Effective July 1, 1980, the Administrative Procedure Act was amended to require a public statement prepared before the hearing is noticed setting forth the evidence relied upon by the agency in proposing the adoption or amendment of a regulation. (Gov. Code, § 11346.7.)

So far as we have been able to determine, the staff study was not based on private surveys or other factual matters unavailable to the public and scholars (cf. *Olive Proration etc. Com.* v. *Agri. etc. Com.* (1941) 17 Cal.2d 204, 210 [109 P.2d 918]), and even if we assume that the Board has a duty to make its staff report available prior to the hearing, it appears that the time period was not unreasonable. Parties who wished, and would be competent, to comment on the analysis of the report would be expected to be familiar with its subject matter, and well versed in the literature on the subject in preparing for the hearing. While the report may have been complex, the prospective witnesses would be familiar with such complexities, and the four-day period to study and comment was not unreasonable.

### B. *Sulfur Dioxide Hearing—Notices*

■ The initial notice of the sulfur dioxide hearing stated that the "staff's data tend to confirm the validity of the previously adopted .04 ppm standard, or a more stringent standard" and that the Board would review all relevant evidence, including evidence supporting a more stringent or lenient standard. A subsequent notice repeated the foregoing and provided that the Board would also consider a standard for sulfur dioxide in combination with other pollutants. The trial court concluded that the notices were too broad in that they contemplated numerous potential standards for sulfur dioxide with or without other pollutants. The trial court was of the view that the notice should have proposed a specific standard and if the evidence at the hearing showed that some other standard was appropriate, a new notice followed by a hearing would be required.

The notice of proposed adoption, amendment, or repeal of a regulation shall include either "the express terms or an informative summary of the proposed action." (Former Gov. Code, § 11424, subd. (c).)[14] One of the objectives of the hearing process is the eventual adoption of a regulation different than that described in the prehearing notice. To confine the agency to its prehearing proposal would negate that purpose. To require a new notice and hearing would tie the agency into time consuming, circular proceedings transcending the statutory purpose: to advise the public of the subject under consideration and to afford a reasonable opportunity to present evidence, views and arguments. Accordingly, the regulation adopted need not be the same as that proposed as long as it deals with the same subject or issue dealt with by the notice. (*Schenley Affiliated Brands Corp.* v. *Kirby* (1971) 21 Cal.App.3d 177, 192-193 [98 Cal.Rptr. 609].)

---

[14]The notice provision of the Administrative Procedure Act is now found in Government Code section 11346.5. It differs substantially from the former provisions.

The sulfur dioxide standard adopted clearly deals with the subject mentioned in the notices, and the notices were not so broad as to preclude effective comment by plaintiffs and other members of the public. Obviously, the same source materials would be presented whether a .04 standard, .05 standard, or a combined .05 standard was proposed, namely, the studies of the dangers of sulfur dioxide pollution. The literature acts as a limiting factor. For example, only those pollutants shown to be dangerous in conjunction with sulfur dioxide need be considered. The determination of the appropriate standard can only be made by comparing it to other potential standards, and no matter how many hearings are held, essentially the same weighing process will be required.

## C. *Sulfur Dioxide Hearing—The Japanese Telegram*

As noted earlier, the health department reported that sulfur dioxide alone is not likely to produce adverse health effects but does so in combination with particulate matter and may do so in combination with oxidants. The department stated that it was aware of no report indicating human health effects at concentrations less than .10 ppm averaged over 24 hours. The staff report—made available to the parties well before the hearing—referred to published Japanese reports (apparently in Japanese) and contained a lengthy discussion of Japanese studies of incidents in which photochemical smog had produced significant adverse respiratory effects. At the public hearing, the plaintiffs objected to this evidence on the grounds that pollutants other than sulfur dioxide might have participated in causing the health effects and that the measurement methodology for determining the sulfur dioxide level was not known. At the conclusion of the hearing the record was kept open until June 5 for the submission of additional materials.[15] On June 6, plaintiffs submitted substantial additional evidence and the Board's staff submitted a telegram from the Japanese government dated June 6 concerning the above-mentioned studies conducted by the Japanese Environment Protection Agency. The telegram purported to summarize the pollutant readings reported in the cited studies but apparently contained lower figures for sulfur dioxide than had been indicated by the staff report summary of the same Japanese sources. The telegram's data also provided support for a combination standard of oxidant levels and sulfur dioxide. Thereafter, plaintiffs petitioned the Board to permit cross-examination of its staff with respect to the Japanese telegram. This request was denied. After the Board's decision, plaintiffs sought rehearing to permit comment on evidence set forth in the Japanese telegram and to comment on the combination standard adopted. These requests were also denied.

---

[15]June 5 was a Sunday. Accordingly the record was held open until the following Monday, June 6, 1977. (See Code Civ. Proc., §§ 10, 12b, 13.)

The trial judge concluded that because the Japanese data was so important it was improper to refuse to reopen the hearing after the telegram was received to permit plaintiffs to comment upon and to rebut the data contained in it.

In *Olive Proration etc. Com.* v. *Agri. etc. Com.* (1941) 17 Cal.2d 204, 210 [109 P.2d 918], the commission's order was based in large part on a field survey requested by the commission and conducted after the hearing. The parties were not apprised of the survey or of its results until after the last order of the commission was promulgated. "As a result they were denied all right of cross-examination with respect thereto and also of an opportunity to make a counter showing in rebuttal. Under such circumstances, the statutory requirement of a hearing was not met." Subsequent cases have stated that *Olive Proration* is limited to situations in which the agency's staff brings in factual material not available to the public. (*Building Code Action* v. *Energy Resources Conservation & Dev. Com.* (1980) 102 Cal.App.3d 577, 588 [162 Cal.Rptr. 734]; *Rivera* v. *Division of Industrial Welfare* (1968) 265 Cal.App.2d 576, 588-589 [71 Cal.Rptr. 739].)

The Japanese source studies cited in the original staff report were available prior to the hearing both from the Board's staff, which held the studies as public records, and from the United States Environmental Protection Agency. ▆▆ "No unfairness occurs when the agency makes use of published research material which is available to the public generally." (*Rivera, supra,* at p. 590.) The fact that, in this case, the research material was published in Japanese does not suggest a contrary result. In this highly technical area it was not unreasonable to expect plaintiffs' experts to familiarize themselves with the available published literature prior to the hearing, even though some of that literature was not published in English, if they wished to be afforded the opportunity to comment upon the data.

▆▆ Generally, there is no doctrine establishing an ineluctable right of cross-examination or rebuttal at quasi-legislative hearings. Former Government Code section 11425 (now Gov. Code, § 11346.8) permitted the agency to proceed upon written submissions, affording no opportunity for oral presentation. This provision does not suggest a legislative intent to guarantee a right of cross-examination in administrative proceedings. To permit rebuttal whenever information is received at a quasi-legislative hearing could mean that the proceeding would be never-ending. On the basis of similar reasoning, the court in *California Optometric Assn.* v. *Lackner* (1976) 60 Cal.App.3d 500, 510 [131 Cal.Rptr. 744], concluded that the contending parties are entitled to confront the body of data upon which the agency intends to act, that the agency may not use the public proceeding as a facade for a private decision resting upon privately acquired data, but that

posthearing information may be considered without violating a fair hearing requirement. (See *Building Code Action* v. *Energy Resources Conservation & Dev. Com., supra,* 102 Cal.App.3d 577, 589.)

 This is not a case where the agency used the public hearing as a facade for a private decision resting upon privately acquired data. To the contrary, the Japanese data was set forth and discussed at some length in the staff report furnished well before the hearing. At the hearing, questions were raised as to the meaning of the data. The Board then requested from the Japanese authorities responses to the questions raised at the hearing. The responses received went beyond the questions raised at the hearing and showed that the staff's original evaluation of the data may have been incorrect in certain respects. While plaintiffs may have been misled by the erroneous staff evaluation, these errors do not give rise to a right of cross-examination or a right to rebuttal. At the hearing and thereafter, plaintiffs and others were free to produce any information relating to the Japanese data or other data contradicting or even correcting the staff evaluation. There is nothing to indicate that the staff errors were intentional.

Because both the staff report and the Japanese telegram purported merely to summarize data publicly available prior to the hearing in the original Japanese reports, we perceive no procedural unfairness in the denial of plaintiffs' requests to comment on the data after the receipt of the Japanese telegram. Thus we conclude that these quasi-legislative hearings were conducted fairly.

The judgment of the trial court is reversed.

Bird, C. J., Mosk, J., Kaus, J., and Reynoso, J., concurred.

**BROUSSARD, J.,** Concurring and Dissenting.—I concur in the portions of the majority opinion concluding that the State Air Resources Board may not reject department recommendations as to the health effects of air pollution and that the board may incorporate a "margin of safety."

However, I must dissent from the majority's determination that the board need not consider the economic effects of proposed standards of ambient air quality. In my view, the board must consider the economic consequences of proposed standards, including the potential loss of industry and jobs and the costs of compliance. I am compelled to this view by the language of the governing statute, Health and Safety Code section 39605,[1] consideration of the board's function as a quasi-legislative agency in the light of fundamental

---

[1]Unless otherwise indicated, all statutory references are to the Health and Safety Code.

principles of governmental responsibility, the history of statutory regulation of air pollution, and other provisions of the Mulford-Carrell Air Resources Act (§ 39000 et seq.).

We should not construe the statute inconsistently, as the majority do, by interpreting section 39606 broadly to permit consideration of a "margin of safety" but interpreting the section narrowly to exclude consideration of the economic consequences of proposed action. We should not construe a statute establishing a government agency with broad quasi-legislative power to permit it ostrich-like to bury its head and refuse to consider the consequences of its own actions, such as the potential loss of thousands of jobs resulting from its standards. In the absence of the clearest language that the Legislature intended the agency to act irresponsibly, we may not conclude that it intended such a result.

Recognizing that the economic consequences of air pollution regulation are potentially great and should not be ignored entirely, the majority take the position that local and regional authorities may take them into account and have "broad discretion to grant reasonable variances" (*ante,* p. 523) not only from local regulations but also from the board's standards. I do not believe that the Legislature intended that, when the board establishes a standard of 25 micrograms of sulfates per cubic meter of air for a basin, local and regional authorities remained free to reject that standard by granting variances and to adopt a standard of 30 or 50 micrograms. Under the statutes, the board's standards are binding on local and regional authorities, not merely guidelines or goals. Local and regional authorities are not in a proper position to adjust the standards adopted by the board, and to permit them to do so runs the risk of defeating the clean air goals of the legislation.

Obviously, effective implementation of the act will require sacrifices by many people. When the government establishes a program which necessitates sacrifices, there is all the more reason for it to show that the interests of those called upon to sacrifice for the common good were fully considered and not ignored by the bureaucracy. Health considerations are paramount, but in connection with such matters as safety factors and economic effects of air pollution, there is room for the consideration of economic impact of the standards to be adopted, and such consideration is required of the board by the statute and fundamental principles of responsible government.

LANGUAGE OF THE STATUTE

The trial court concluded that the board violated section 39606 by failing to consider the effects on the economy of standards to be adopted. The court construed the statute to require the board to consider the economic costs of

compliance with the standards adopted. It relied upon the language of the section, which is not limited to health and safety but also includes welfare, and the history of air quality regulation in California as showing legislative intent that the costs of compliance were to be considered. The court reasoned that local districts could not consider the economic impact of the standard but only the most economical method of meeting the standard, and that unless the state board considered the economic impact of its regulations no agency would. In this connection the court stated: "If the Legislature did not want [the board] to consider effects on the economy in carrying out the Legislature's directive, it could simply authorize [the board] to adopt standards prohibiting the presence of all deleterious pollutants in the atmosphere. Such Draconian measures would certainly give complete protection to the health of all human beings but at the same time it would be disastrous to our economy."

The board does not claim that it considered the costs to the economy of complying with the standards it adopted. Its position is that it need not consider such costs. It urges that the "effects on the economy" it is required to consider by section 39606 are the effects of air pollution on the economy, not the effect of the board's standards.

In construing a statute to determine the intent of the Legislature we turn first to the words themselves for the answer. (*Tracy* v. *Municipal Court* (1978) 22 Cal.3d 760, 764 [150 Cal.Rptr. 785, 587 P.2d 227].)

The relevant portion of section 39606 provides that the board shall adopt "standards of ambient air quality for each air basin in consideration of the public health, safety, and *welfare,* including, but not limited, to health, illness, irritation to the senses, aesthetic value, interference with visibility, and *effects on the economy.*" (Italics added.) The reference to "public health, safety, and welfare" is ordinarily a reference to the police power of the state, reflecting the breadth of matters to be considered by the board, and the public welfare has long been held to embrace regulations designed to promote the economic welfare, public convenience, and general prosperity of the community. (E.g., *Graham* v. *Kingwell* (1933) 218 Cal. 658, 659 [24 P.2d 488].) The use of such terminology can only be read as meaning that the Legislature intended the matters were to be considered in a broad rather than restrictive light. Indeed, in the discussion of safety margins, the majority recognize: "The language of section 39606, directing the Board to adopt standards in consideration of the public health, safety, and welfare, reflects the breadth of matters to be considered by the Board." (*Ante,* p. 516.) The view also finds support in the fact that the following clause is "including but not limited to," again reflecting the breadth of the matters to be considered. Furthermore, the term "effects on the economy" gram-

matically relates to standards to be adopted rather than air pollution, a term not appearing in the section.

The majority initially argue that because standards cannot cause illness, irritate the senses, interfere with visibility or be aesthetically displeasing, the Legislature intended to focus the board's attention on the effects of pollution. The majority then reason that the following term in the statute, "effects on the economy," like its antecedents must be read to refer to the consequences of air pollution, rather than to the potential economic effects of air quality standards.

There are a number of defects in this line of reasoning. First, it omits mention of the first of the specified terms, health. No one claims that air pollution causes health; the thought is absurd and the majority's categorization of the terms fails. This defect is alone obviously fatal to the majority's argument but there are other equally clear objections to the argument.

Second, the majority's reasoning is an attempt to limit the plain language of the statute, and it should be entitled to little, if any, weight when we are construing a statute which grants broad quasi-legislative power to an agency to consider "public health, safety, and welfare." Obviously, the term "welfare" in this context is intended to be expansive rather than limiting, and a limiting rule of construction or reasoning designed to limit should not be applied.

Third, employment of the majority's rule of construction appears inappropriate when we are considering a statute which grants broad quasi-legislative power to adopt standards and speaks of the matters to be considered. Because quasi-legislative power is granted, it is to be anticipated that the agency will balance several factors in adopting regulations. But the limiting rule of construction tells us, as the majority illustrate today, that all factors must be read to point in the same direction. If so, there is nothing to balance. Under the majority's construction, it would seem to follow that the board which may employ safety factors and has nothing to weigh against the evils of air pollution should prohibit all air pollution, and it seems impossible to justify the standards adopted insofar as they permit any air pollution.

Fourth, the majority overwork their rule of construction by using it to limit not only the term "effects on the economy" in the statute but also the word "welfare." Even assuming that the term "effects on the economy" reasonably might be limited to economic effects of air pollution, this is not helpful to the majority. Limiting the term "effects on the economy" on the basis of its associates may not serve to also limit the term "public . . .

welfare" because the Legislature in no uncertain terms has told us that it may not. The wording of section 39606 is to adopt standards "in consideration of the public health, safety, and *welfare, including, but not limited to,* . . . effects on the economy." (Italics added.) Thus, even if we agree with the majority that "effects on the economy" must be limited to effects on the economy caused by air pollution, we may not use the restricted definition of "effects on the economy" to limit the meaning of the term "public . . . welfare," because the Legislature has expressly told us that "effects on the economy" does not limit the preceding words by stating, "including, but not limited to." We are left then with the term "public . . . welfare" unrestricted, and no citation of authority is required for the proposition that public welfare, absent limiting provision, encompasses economic concerns generally.

Fifth, the board is not merely an investigating agency but is a regulatory agency. Thus, it is not merely concerned with the effect of air pollution on such matters as health and the economy but ultimately must determine the effects, if any, of proposed standards so that it may choose the appropriate one.

Finally, it appears to me that the majority position is internally inconsistent in its interpretation of section 39606. First, the majority tell of the breadth of matters to be considered by the board in concluding that the board may adopt safety margins. (*Ante,* pp. 515-516.) There is no discussion of reasoning limiting the board to consideration of the effects of air pollution. The reasoning is only invoked as to economic effects. Obviously, safety margins are no more a cause of air pollution than are standards. Safety factors are no more associates of illness, irritation of the senses, interference with visibility or aesthetically displeasing than are the economic consequences of potential standards. The majority only appear to apply their reasoning when they find it convenient.

I find it difficult to conceive of broader language that the Legislature might have used to describe matters that a state agency may consider than "public health, safety, and welfare." Further, "effects on the economy" points directly to economic impact of the agency's work. Even if the latter words did not do so, they are prefaced by the familiar term "including, but not limited to" making it abundantly clear that the Legislature did not want the word "welfare" limited to succeeding terms. The language of the statute thus requires the board to consider the economic impact of proposed standards before adopting them.

### GOVERNMENTAL RESPONSIBILITY

The board is granted quasi-legislative powers the exercise of which may have a profound effect on our society, including health, social and economic

matters. Common sense dictates that in the absence of the clearest showing of legislative intent to the contrary, the matters to be considered by the board in exercising its powers should be commensurate with its responsibilities. The board is charged not merely with determining the need for regulation but must determine the best methods of regulation and the extent of regulation. To do its job responsibly it must consider the consequences to health and the economy of the proposed regulations. By ignoring the consequences of its own regulations, an agency runs the risk that it may cause more mischief than it cures.

Obviously, ambient air quality standards adopted by the board may have major effects on our economy, possibly substantially limiting industry and employment. In a closely related code section, the Legislature has recognized that clean air regulations may have important economic effects and made clear its intent to require the board to consider the economic impact of its regulations. Providing that the board shall adopt emission standards for new motor vehicles, the Legislature stated: "Prior to adopting such standards, the state board shall consider the impact of such standards on the economy of the state, including, but not limited to, their effect on motor vehicle fuel efficiency." (§ 43101.)

The language of the section, "impact . . . on the economy," is not substantially different from "effects on the economy" in section 39606, and the additional words "of such standards" in section 43101 do not warrant a distinction because section 39606 is concerned with matters to be considered in adopting standards. Motor vehicle fuel efficiency is an economic matter, and section 43101 tells us that it is "included" in "impact . . . on the economy." Effects on the economy likewise should be read to include relevant economic concerns.

Automobile emissions are a major cause of air pollution. The legislative determination that impacts on the economy are to be considered in adopting emission standards reflects not only legislative concern that the standards adopted might have undesirable effects on the economy but also legislative belief that the agency can effectively consider those effects with the health hazards of air pollution.[2]

The trial court recognized that unless economic impact of proposed standards was considered by the board, there was a danger that the standards adopted would be disastrous to our economy. Because the board refused to

---

[2]Because the Legislature has provided for weighing health and economic concerns with respect to automobile emissions, arguments of amici that it is impossible or impractical to do so appear questionable. Moreover, the Legislature as well as individuals constantly weigh economic concerns with health, social and personal concerns.

consider evidence as to economic effects, we do not know whether the standards adopted will have the effect of crippling some industries, causing widespread layoffs, and preventing the normal growth of industry.

STATUTORY HISTORY AND ADMINISTRATIVE CONSTRUCTION

The historical background confirms that the board must consider the impact of proposed standards on the economy. Prior to 1967, the health department adopted standards for the quality of the air. The original provision made no reference to the public welfare or economic impact. (Former § 426.1, Stats. 1959, ch. 835, p. 2885.) Local districts were authorized to regulate air pollution (former § 24260) but there was no provision making the department's standards mandatory for the districts. Thus, the standards were goals rather than regulations.

In 1967 the Legislature authorized the board to adopt ambient air quality standards providing for the first time for consideration of the public welfare including effects on the economy. It also provided that local districts shall comply with the standards of the board, and nothing in the law excused them because they may have believed that the board adopted a standard which was uneconomic. (Stats. 1967, ch. 1545; former §§ 39051, 39313.) In addition, the statutory scheme empowers the board to oversee the effectiveness of local programs and regulations (§ 41500, subd. (b)), and the board has adopted stricter regulations for a district when it found the district's emission regulations too lenient. (*Stauffer Chemical Co.* v. *Air Resources Board* (1982) 128 Cal.App.3d 789, 793 [180 Cal.Rptr. 550].) As the trial court concluded, before 1967 local districts could be expected to consider local economic concerns in adopting pollution regulations to accomplish the health department goals but when the Legislature provided for mandatory standards to be adopted by the board it provided for the board's consideration of economic effects of these standards.

The majority's argument on the basis of long-standing administrative interpretation (e.g., *Rivera* v. *City of Fresno* (1971) 6 Cal.3d 132, 140 [98 Cal.Rptr. 281, 490 P.2d 793]), and the reenactment rule (e.g., *Division of Industrial Safety* v. *Municipal Court* (1976) 61 Cal.App.3d 696, 701 [132 Cal.Rptr. 573]), is predicated on title 17 of the California Administrative Code, section 70101. The section is a general statement of policy. One provision of the section states: "The objective of ambient air quality standards is to provide a basis for preventing or abating the effects of air pollution, including effects on health, esthetics and economy." The question before us is not whether the board shall consider the effects of air pollution on the economy; under any interpretation of section 39606 the board may consider the effects of air pollution on the economy. The question is whether

the board must consider the impact of its standards on the economy. The regulation is silent as to that issue. Moreover, the authority cited for the regulation is not section 39606 but two other code sections. In these circumstances, there is no long-standing administrative interpretation limiting the broad language of section 39606 and therefore no reenactment following administrative interpretation.

The majority also rely upon *Lead Industries Ass'n* v. *Environmental Protection* (D.C. Cir. 1980) 647 F.2d 1130, 1148, where it was held that in establishing ambient air quality standards under the Clean Air Act (42 U.S.C. § 7401 et seq.) the administrator need not consider economic or technical feasibility. The court pointed to statutory history for the view that if industries could not meet the standards, they should be shut down or come to Congress for relief. (647 F.2d at pp. 1148-1154.) There is no comparable legislative history for the state statutes.[3] The federal court also states that there is no language in the federal act that economic feasibility was to be considered. In contrast, section 39606 requires the board to consider economic effects.

The relationship between the two statutes provides further reason to require consideration of economic effects when the board goes beyond implementation of the federal act. The federal act provides for state implementation of the federal standards. There are primary federal standards which the state must seek to implement within five years, and secondary standards to be implemented within a reasonable time which may be more strict than the primary standards. (*Lead Industries Ass'n* v. *Environmental Protection,* *supra,* 647 F.2d at pp. 1137, 1180.) In addition to its duty to adopt ambient air standards under section 39606, the board is directed to implement the Clean Air Act. (§ 39602.) However, the Legislature subsequently limited the implementation power, providing: "Notwithstanding any other provision of this division, the state implementation plan shall only include those provisions necessary to meet the requirements of the Clean Air Act." (*Ibid.*) The effect then of sections 39602 and 39606 is that the board must implement the Clean Air Act, but when it goes beyond the federal clean air standards, it must consider broad factors such as the public welfare and economic effects of its standards, including not only the potential costs of devices to limit air pollution, but also potential limitations on economic growth and resulting loss of jobs.

### LOCAL AND REGIONAL AUTHORITIES

The majority, in apparent recognition that the economic consequences of application of the board's standards are potentially great and should not be

---

[3]The state statutes were first adopted prior to the federal act, and there is no basis to conclude that our statutes were adopted in the light of the Clean Air Act legislative history.

ignored entirely, take the position that the power to grant variances given to the local and regional agencies permits them to grant variances from the state standards. In my view the local and regional agencies may grant variances from their rules and regulations but may not grant variances from the standards established by the board. To permit local districts to depart from the standards adopted by the board is contrary to the statutory pattern and specific provisions of the statutes, creates an administrative quagmire, and jeopardizes the entire clean air program.

As pointed out in *Stauffer Chemical Co.* v. *Air Resources Board, supra,* 128 Cal.App.3d 789, 792-793, "[u]nder the air pollution control provisions of the Air Resources Act, as amended (Health & Saf. Code, § 39000 et seq.), the Board is under a duty to '[a]dopt standards of ambient air quality for each air basin [in the state]' (§ 39606, subd. (b)). Once adopted, it becomes the duty of local and regional air quality districts, including respondent district, to promulgate and implement rules and regulations reasonably assuring achievement and maintenance of the state standards. (See §§ 40000-40002.) The statutory scheme empowers the Board to oversee the effectiveness of local programs and regulations (see § 41500, subd. (b)) with ultimate authority to establish a program or 'rules and regulations . . . necessary to enable the district to achieve and maintain such ambient air quality standards.' (§ 41504, subd. (a).)[3]" (Fn. 2 omitted.)

In *Stauffer Chemical Co.,* the board adopted regulations superseding regulations adopted by the Bay Area Air Quality Management District governing sulfur dioxide emissions from industrial facilities in the Bay Area. The board's regulation reduced the amount of allowable sulfur dioxide emissions from specific sources. The court upheld the board's regulations. Section 41504, subdivision (a) and the case show that the board is to ultimately determine the air quality standard and that to assure conformance to its standard it may supersede local regulations. To permit local authorities to grant variances from the board's standard of 0.05 parts per million sulfur dioxide and establish a standard of 0.06 parts per million appears inconsistent with the board's power to insist that local rules and regulations achieve its standards.

Other statutes similarly make clear that it is for the board rather than local authorities to determine whether local conditions warrant a special standard of ambient air quality. The basic statute with which we are concerned,

---

"[3]Subdivision (a) provides: 'If, after a public hearing, the state board finds that the program or the rules and regulations of a district will not likely achieve and maintain the state's ambient air quality standards, the state board may establish a program, or portion thereof, or rules and regulations it deems necessary to enable the district to achieve and maintain such ambient air quality standards.'"

section 39606, provides that the board shall divide the state into air basins and adopt "standards of ambient air quality *for each air basin* in consideration of the public health, safety, and *welfare* . . . ." (Italics added.) Thus, the basic statute authorizing the board to adopt standards contemplates that those standards may vary on the basis of local concerns.

The local district's power to adopt rules and regulations is expressly made subject "to the powers and duties of the state board" (§ 40001), and thereby emphasizing that local authorities must conform to the board powers, and there is nothing to indicate that they may claim some exemption based on economic hardship or otherwise.

Most importantly, the provision granting districts power to grant variances provides only for variances from the provisions of section 41701 (a provision prohibiting emissions greater than a defined opacity) and from district rules and regulations. The section reads: "Any person may apply to the hearing board for a variance from Section 41701 or from the rules and regulations of the district. . . ." (§ 42350.) The absence of any reference to state board standards should be conclusive in the circumstances before us.

Practical considerations also point to the conclusion that the districts should be bound by the standards adopted by the state agency and are not free to depart from them by granting variances. If the district on the basis of local economic hardship is to be permitted to grant variances from the sulfur dioxide standard of 0.05, the local district should before doing so weigh health and other hazards against the economic hardship. But to do this the districts would have to consider all the health and other evidence considered by the board. Such a great undertaking does not seem contemplated by the variance procedure.

Rather, the districts adopt rules and regulations attempting to meet the board's standards, and the variance procedure contemplates that variances to the districts' rules and regulations when coupled with the rules and regulations will not violate the board's standards. If local authorities are of the view that the board's standards are unduly restrictive and will result in great and unjustified economic hardship, their remedy is to request the board to reconsider the standards for the basin.

The variance procedure does not contemplate that variances will be a means to avoid compliance with the board's standards and should not serve to jeopardize the clean air program. As we have seen, the 1967 statute was adopted when the former law which made the state standards mere goals or guidelines proved ineffective, and the 1967 law required the districts to

comply with the state standards. (Stats. 1967, ch. 1545; former §§ 39051, 39313.) The variance power should not be applied to reduce the state standards to goals or guidelines.

I am satisfied that the board must consider the economic impact of contemplated standards. This does not mean that the board must enter into a formal cost-benefit analysis attempting to put monetary valuations on the benefits of reduced air pollution.[4] Rather, the board must consider the impact on the economy of its standards along with the other factors enumerated in section 39606.[5]

The board's refusal to consider evidence as to the economic effect of standards to be adopted requires affirmance of the judgment. Had the board considered economic effects, it might have adopted a combined standard for sulfates or used a different safety factor in establishing the standard for sulfur dioxide. (Cf. *Southern Cal. Gas Co.* v. *Public Utilities Com.* (1979) 23 Cal.3d 470, 477 [153 Cal.Rptr. 10, 591 P.2d 34]; *City and County of San Francisco* v. *Public Utilities Com.* (1971) 6 Cal.3d 119, 129 [98 Cal.Rptr. 286, 490 P.2d 798].)

I would affirm the judgment.

---

[4]In *American Textile Mfrs. Inst.* v. *Donovan* (1981) 452 U.S. 490 [69 L.Ed.2d 185, 101 S.Ct. 2478], the United States Supreme Court rejected a cost-benefit analysis for OSHA as to standards for toxic materials and harmful physical agents. (452 U.S. at p. 512 [69 L.Ed.2d at p. 203].) However, the court also held that the administrator must determine economic feasibility of his regulations. (452 U.S. at pp. 522-536 [69 L.Ed.2d at pp. 209-218].)

[5]I concur in the portion of the majority opinion dealing with procedural issues. However, I must point out that the Japanese telegram was contrary to the report of the health department in that the latter stated that no report had indicated health effects at concentrations of sulfur dioxide less than .10 parts per million averaged over 24 hours whereas the Japanese telegram indicated health effects at lower levels. As the majority hold, the board must follow health department recommendations for standards relating to health effects. (*Ante,* pp. 511-512.) When the board is confronted with evidence presented which contradicts the health department report, it should call the evidence to the attention of the department and solicit its views. It did not do so. However, the parties did not request additional health department comment, and in this proceeding the parties did not claim that the board erred in failing to seek health department comment. In these circumstances, we may not set aside the sulfur dioxide standard on the basis of failure to consult the health department.